445 So.2d 858 (1983)
ARKEL LAND COMPANY
v.
Barney CAGLE and Sally Cagle.
81-575.
Supreme Court of Alabama.
September 23, 1983.
Rehearing Denied February 3, 1984.
*859 Jack Livingston and Gerald R. Paulk of Livingston, Porter & Paulk, Scottsboro, and John H. Morrow and Walter J. Sears of Bradley, Arant, Rose & White, Birmingham, for appellant.
William J. Baxley and Joel E. Dillard of Baxley, Beck & Dillard, Birmingham, for appellees.

ON APPLICATION FOR REHEARING
PER CURIAM.
After further consideration of this case by the entire Court, the original opinion is withdrawn and the following is entered as the opinion of the Court.
This case involves disputed factual issues in a fraud action. The trial court granted judgment on a jury verdict for the plaintiffs and overruled defendant's motion for new trial or, in the alternative, for judgment notwithstanding the verdict. The appellant, Arkel Land Company, argues that the verdict was not supported by the evidence and the action was barred by the statute of limitations.
This appeal turns on questions of alleged fraudulent misrepresentations inducing plaintiffs to execute a coal mining lease, the time of discovery of the fraud, and an assertion of estoppel to raise the statute of limitations because of assurances by an agent of defendant Arkel that plaintiff need not hire a lawyer. A full discussion of the facts is necessary for a decision in this case.
In 1969 or earlier, Wyatt Stuart, representing Arkel's predecessor corporation, Farco, approached Barney Cagle on his farm and asked if he wanted to lease his coal lands to Farco. Cagle replied that he did not. Stuart asked again on various other occasions, and Cagle continued to refuse. In 1969, Farco sold its stock and holdings to Arkel and Arkel's holding company, Arch Mineral Corporation. Soon thereafter, Arkel raised the royalties Farco had been offering, from five cents per ton where the lessor did not own mineral rights and ten cents where the lessor did own mineral rights, to ten cents and twenty cents.
Stuart continued to ask Cagle if he wanted to lease to Arkel at the new rate. Cagle refused for a time but later agreed to lease in December 1970. Cagle owned 315 acres of land, most of which he farmed. Jackson County Highway 92 ran through his property, leaving about 65 acres on the east side of the road and the remainder on the west. Cagle told Stuart he did not want to lease the property east of the road because he wanted his son to have it.
Stuart and Cagle went to Joe Dawson, a local attorney, for Dawson to draft the lease. Stuart testified that Dawson represented Arkel in Jackson County and drafted Arkel's leases in the area. Dawson had also represented Cagle on a number of occasions and knew that Cagle was in tight financial circumstances at the time. Cagle testified that he did not know at the time that Dawson was representing Arkel.
Cagle and his wife Sally went to Dawson's office with Stuart on December 19, 1970. Dawson presented a short form lease to be executed for recording and a long form lease to which the short form referred as containing the terms of the lease. The property descriptions in both leases included all 315 acres. Mr. and Mrs. Cagle objected, saying that they did not want to lease the property east of the road. Dawson, according to the Cagles, replied that he could not take the property out of the short form lease but he would leave it out of the long form lease. The Cagles agreed to sign on this condition.
Dawson changed the last page of the long form lease to include the following paragraph:
"Lessee covenants and agrees with Lessor that Lessee will not mine any coal from any part of the South half of the Southwest quarter of Section 18, Township 2 South, Range 10 East which is *860 East of the public highway, which is known as County Highway No. 92, and which runs in a North and South direction across the Southwest quarter of the Southwest quarter of said section 18, without the written consent of the Lessor."
The Cagles signed both this and the short form lease. Dawson sent copies to Arkel and had the short form lease recorded.
In 1978, Cagle attempted to lease the coal under the property east of the road to Invesco, a mining company. Invesco searched title, found the short form lease, and informed Cagle the coal was leased to Arkel. Cagle complained to Dawson, who set up a meeting with Jack Allen, a representative of Robertson & Associates. In 1977, Arkel had assigned its rights under the lease to the Tennessee Valley Authority, and Robertson & Associates was mining for TVA. Allen refused to release Cagle from the lease, stating that the Cagles might consent to allow TVA to mine the property by the time TVA was ready to mine it. Cagle testified that late in 1978 he asked Dawson if he should get another lawyer, but Dawson said there was no need, he would take care of it. Cagle testified that Dawson repeatedly assured him for a year or more that he would straighten out the problem. In February of 1980, Cagle did go to another lawyer, his present counsel, who filed this suit in August 1980.
The Cagles sued Arkel and Stuart for compensatory and punitive damages arising out of alleged fraudulent misrepresentations inducing the Cagles to execute the leases to Arkel. They included but later dropped a second count for cancellation of the lease. A motion to dismiss the complaint was filed for the reason, among others, that Arkel had been dissolved in 1977. The Cagles conducted discovery and filed an amended complaint seeking to add certain parties. Of these, all were stricken except Arch Mineral Corporation, which owned all of Arkel's stock upon the dissolution of Arkel. The court ordered a separate trial for Arch; the claims against Arkel and Stuart proceeded to trial.[1]
After a jury verdict and judgment for the Cagles for the sum of $250,000.00 against Arkel, Arkel filed a motion for a j.n.o.v. or a new trial, alleging, inter alia, insufficiency of the evidence, the statute of limitations, and the verdict being a product of prejudice. The trial court denied this motion and entered a Rule 54(b), A.R.Civ.P., order of finality, the claim against Arch Mineral Corporation being still pending. Arkel brought this appeal.
In deciding this appeal, we must be mindful of the standard for reviewing a decision of a trial court not to grant a motion for a new trial on the grounds of insufficiency of the evidence:
"[T]he decision of the trial court, refusing to grant a new trial on the ground of the insufficiency of the evidence, or that the verdict is contrary to the evidence, will not be reversed, unless, after allowing all reasonable presumptions of its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince the court that it is wrong and unjust."
Cobb v. Malone, 92 Ala. 630, 635, 9 So. 738 (1891); Hubbard Bros. Constr. Co. v. C.F. Halstead Contractor, Inc., 294 Ala. 688, 321 So.2d 169 (1975).
Arkel argues that the Cagles signed the long form lease with full awareness of the above-quoted provision that the land east of the road would not be mined without the written permission of the Cagles. Thus, Arkel contends, the evidence does not support a finding of fraudulent misrepresentation that the land east of the road was not included in the lease.
The Cagles counter that they relied on Dawson, not knowing at the time that he *861 was acting as agent for Arkel, when he told them that the land east of the road would not be included in the long form lease. They point out that Mr. Cagle has only a fifth-grade education and his wife is accustomed to leaving business matters to him. They cite Southern Building & Loan Ass'n v. Dinsmore, 225 Ala. 550, 144 So. 21 (1932), as supporting their argument that the writing does not bar their fraud action where they allege that an agent of the defendant misrepresented its contents or its effect. In that case,
"plaintiff did not read the certificate and there is no evidence he had any actual knowledge of its contents, and his proof tends to show that he was lulled into a feeling of security and into any neglect to read the same by the misrepresentations of the agent. Under these circumstances the law imputes to him no knowledge of its contents .... The jury could infer that the agent knew the plaintiff was a farmer with little or no experience in the matter of corporate stock ...."
Id., 225 Ala. at 552-53, 144 So. 21 (citations omitted).
In this case, although Mr. and Mrs. Cagle both knew of the added clause, it is not clear that either read it and understood it. Mrs. Cagle's testimony included the following:
"Q. Well, did he also include in that a provision that that property east of the road could not be mined without yours and your husband's written consent?
"A. Well, I didn't give it no thought; I just thought that he had it fixed okay.
"Q. That was what you all talked about, and that was actually what Mr. Dawson put in the lease; wasn't it?
"A. About it would not be mined?

"Q. Yes, ma'am.
"A. He put that in there; I remember noticing it right at the top; and I thought, `Well,"
"Q. That's right above your signature?
"A. Yes, sir; but I thought that he had it fixed right." (Emphasis added.)
It is not clear that Mrs. Cagle read the whole paragraph to learn that it said Arkel agreed not to mine the land without written consent.
The Cagles' son Bronlee and Mr. Cagle's farming partner, Homer Reece, testified that they heard Stuart tell Mr. Cagle at the farm that the land east of the road would not be included in the lease. Both of the Cagles testified that Mr. Cagle insisted at the closing that the land east of the road not be included in the lease. Mr. Cagle admitted he knew the description in the short form lease included all the property, but maintained that Dawson said he could not take the land east of the road out of the short form but would leave it out of the long form.
Clearly, whether the land was left out of the lease entirely or included with a proviso that it could only be mined with their written consent made a material difference to the Cagles. In the latter event, the lease created a cloud on the title to the land east of the road which worked to the injury of the Cagles in numerous ways, including the inability to lease the land to Invesco. No reason exists in fact or in law for the short form lease to include the property and the long form to leave it out or provide that it can only be mined with permission, and Arkel has not attempted to advance such a reason.
If one believes the Cagles' testimony, as the jury was entitled to do, it is clear that they thought Arkel would have no lease on the land east of the road and they did not understand the legal significance of including the land in the lease with a proviso that it would not be mined without written consent. Cagle was asked:
"Q. All right; and you did have a discussion about the twenty acres of landor the lands that lay on the east side of the road, with Mr. Dawson, didn't you?
"A. Yes, sir.
"Q. And what, if anything, did he tell you?

*862 "A. He told me that they would leave it out, and I kept calling his hand to it; and he said, `I'm going'He said he was writing the short form; and he said, `I can't leave it out on this short form, but I'm going to come back with a long form and leave it out."
This lack of understanding of the actual effect of the Arkel leases is also evident from the fact that Mr. Cagle attempted to lease the land to Invesco in 1978.
The fact that Dawson, acting as agent for Arkel, lulled the Cagles into believing that the lease reflected their wish not to lease the land east of the road, brings the case within the rule of Southern Building & Loan Ass'n v. Dinsmore, supra. The Cagles also quote Parker v. Ward, 224 Ala. 80, 82, 139 So. 215 (1932): "When the statement of a fact is assumed to be within the knowledge of the person making it, the other has the right to rely on its truth, and in the absence of anything to arouse suspicion is not bound to make inquiry or examine for himself." Certainly the Cagles could rely on the truth of Dawson's statement that he was taking the land out of the long form lease, and they were not bound to inquire further because they thought Dawson represented them and did not know he worked for Arkel.
Arkel argues that Dawson was not its agent. The record indicates, however, tht Dawson worked out the terms of leases for Arkel. He testified: "Well, we hadThese leases, if you will look at them, they are all practically the same form; and the only thing that we would do would be to change that part of the form that had to be changed in order for it to fit that particular one." He went to Arkansas for the closing of the sale of Farco to Arkel, and he testified that he was the only attorney for Arkel in Jackson County. Arkel, not Cagle, paid him for drafting the Cagles' lease.
Dawson was evasive about whether he was on retainer to Arkel:
"Q. But you say that you were not on a retainer for them?
"A. I never was on a retainer.
"Q. Are you sure of that?
"A. Yes, sir.
"Q. Do you recall on your deposition... that you were asked the question, `How were you initially retained or paid by Arkel?'
"A. I think so.
"Q. Do you recall that you answered, `We were paid a retainer, and we were paid so much an hour for the time that we devoted to them'?
"A. I expect that's what I answered, because we were paid a retainer for a short time.
"Q. You were paid a retainer for a short time?
"A. For a very short time.
"Q. And
"A. Then we were paid on an hourly basis."
Dawson negotiated leases with other landowners in the area. All of the leases introduced into evidence contained terms more favorable to the lessors, chiefly in larger initial payments than the Cagles received and shorter terms with renewal provisions. These other lessors had not acted under the impression that Dawson was representing them, but rather had negotiated on their own behalf or had independent representation.
Clearly, then, this evidence was sufficient to support a factual finding that Dawson was representing Arkel as his client. "Omissions and commissions of an attorney are to be regarded as the act of the client whom he represents." Nelson v. Darling Shop of Birmingham, Inc., 275 Ala. 598, 604, 157 So.2d 23 (1963); Lawrence v. Gayle, 294 Ala. 91, 312 So.2d 385 (1975).
A principal is liable for the fraud of its agent, committed in the course of his employment, where others rely on the fraudulent misrepresentations to their detriment. District 20, UMWA v. Sams, 287 Ala. 312, 251 So.2d 613 (1971), cert. denied, 404 U.S. 1017, 92 S.Ct. 677, 30 L.Ed.2d 664; *863 Hagood v. Knight, 257 Ala. 64, 57 So.2d 616 (1952).
The fraud is imputable to Arkel not only through Dawson, but also through Stuart, who was present and knew of the provision. Stuart, a former probate judge, would also have known the legal significance of requiring permission to mine the land rather than leaving it out altogether. The Cagles testified that Stuart repeatedly insisted at the closing that Arkel wanted a lease on the land east of the road. Stuart's testimony also supports the finding that Dawson acted as Arkel's agent. The Cagles' attorney asked him if he and Dawson worked together for Arkel:
"A. We worked together as much as we could; I'd talk to property owners and get the description of their property and take it to Mr. Dawson.
"Q. Okay; and as a matter of fact, every lease ... was prepared by Joe Dawson representing Arkel or Arch or whichever one was the owner; he did all of those, didn't he?
"A. I believe that there were several that he didn't do, sir; but that was because the property owners requested somebody else to do it.
"Q. Okay; but what percent of them did Mr. Dawson do?
"A. Ninety-nine percent of them."
The agency question also arises in connection with the statute of limitations issue: Cagle knew in 1978 that the Arkel lease did include the land east of the road, but he did not bring suit for more than a year. Dawson, however, told him not to worry about it, that he would take care of it. Cagle testified:
"He told me that he would get it straightened out, that it shouldn't have been in there; it shouldn't have been worded like it was; and he felt like that it was his fault; and I asked him did he think that I ought to hire a lawyer; and he said, `No'; he said that, `There's no need in going out here spending your money for a lawyer'; he said, `I'll get it straightened out for you.'"
Cagle testified that Dawson put him off in that manner until February of 1980, when he went to his present counsel. The Cagles argue that Arkel is estopped to raise the statute of limitations for this period because Dawson persuaded them not to bring suit. We agree with this position, and we hold that the jury was entitled to find that Dawson was continuing to act as agent for Arkel. He testified that he was representing Arkel in a case even at the time of trial. Moreover, Cagle knew in 1978 that Dawson had represented Arkel at the closing in 1970 and Dawson's assurances implied that he still had authority to speak for Arkel.
The judge instructed the jury on this estoppel argument:
"Ladies and gentlemen, if one, by his own action, induces another not to file suit or not to take any action, then he is estopped to plead the statute of limitations. So if the plaintiffs were induced by Arkel or its agents to take no actions, then Arkel would be estopped to plead the statute of limitations so long as this inducement continued.... [W]hether or not the rules of estoppel would apply is a question of fact for you to determine, along with many other questions of fact that exist in this case."
This is a correct statement of the law. Mason v. County of Mobile, 410 So.2d 19 (Ala.1982); Seybold v. Magnolia Land Co., 376 So.2d 1083 (Ala.1979); City of Montgomery v. Weldon, 280 Ala. 463, 195 So.2d 110 (1967).
The judge instructed the jury that it could return a verdict only against Arkel on the issue involving the land east of the road because estoppel does not apply to Stuart. The Cagles also claimed that Stuart told them the price Arkel was offering was the highest price being paid in Alabama and the highest price they would see in their lifetime. They alleged that they only discovered this alleged misrepresentation in 1980 when they went to their present attorney who told them higher prices were paid in other parts of the state *864 in 1970. The trial court instructed the jury to return a verdict against both Stuart and Arkel only if it found in favor of the Cagles on this issue. Because the jury returned no verdict against Stuart, the parties concede that the jury found in favor of the defendants on the "highest price" issue and do not raise it in this appeal.
Arkel argues that the verdict was a result of prejudice raised in the jury by references the Cagles and their attorneys made to the wealth of Arkel and to mining by TVA on the land east of the road. The first of these matters arose when the court allowed the Cagles' counsel to ask the prospective jurors, over objection, whether they had any connection to the Hunt brothers, who are Texas oil millionaires, or to Ashland Oil Company. The Cagles had attempted to add Ashland and the Hunts as defendants, based on a deposition taken from Stuart. The court granted a motion to strike Ashland and the Hunts as parties, because Arch was the sole stockholder of Arkel at the time of dissolution. Nevertheless, it was not improper for the Cagles' counsel to ask the prospective jurors if they were associated with Ashland or the Hunts in light of the possibility that those parties had a connection with Arch. The trial court did not abuse its discretion in allowing this question. Shelby County v. Baker, 269 Ala. 111, 110 So.2d 896 (1959); Louisville & N.R. Co. v. Davis, 236 Ala. 191, 181 So. 695 (1938).
The second area of alleged prejudice, the mining of the land by TVA, relates directly to the damages suffered by the Cagles: If Arkel had not included the land east of the road in the lease, its assignment to TVA would not have affected that land. We find no error in the overruling of objections to this testimony.
We conclude that there is substantial evidence from which the jury could infer that Dawson was in fact representing Arkel as its agent and that he intentionally misled the Cagles as to the legal effect of the two leases. Cagle relied on the misrepresentation of Dawson, thinking that Dawson, who had previously represented him, was his attorney and was looking out for his interest. After Cagle learned of the legal problem arising from the two inconsistent leases, Dawson reassured him that he would cure the problem and told him he did not need to involve new counsel.
Thus the essential elements of a fraud action are present: an intentional misrepresentation by an agent or agents of Arkel, intended to induce the Cagles to sign the lease, and reliance by the Cagles upon that misrepresentation to their detriment. Additionally, as to the statute of limitations question, Dawson lulled Cagle, who had only a fifth-grade education, into taking no further action. The verdict was supported by the evidence, and the trial court did not err in denying Arkel's motion for new trial or j.n.o.v.
The judgment of the trial court is due to be, and is hereby, affirmed.
REHEARING GRANTED; ORIGINAL OPINION WITHDRAWN; AFFIRMED.
JONES, ALMON, SHORES, EMBRY and BEATTY, JJ., concur.
TORBERT, C.J., dissents with opinion.
MADDOX, FAULKNER, and ADAMS, JJ., dissent, with opinion by FAULKNER, J.
TORBERT, Chief Justice (dissenting).
I am of the opinion that this action was clearly barred by the statute of limitations applicable to actions for fraud and deceit. The Code sections involved, Code 1975, §§ 6-5-100 through -104, are governed by the one-year statute of limitations set forth in Code 1975, § 6-2-3. The one year begins to run on the date upon which the aggrieved party discovers the facts constituting fraud. The testimony of the plaintiffs indicates that they were aware in 1970, when the lease was executed, that the land east of the road was included in the short form lease. Further, the long form lease also included a description of property "which is East of the public highway, which is known as county Highway *865 No. 92." Thus, if there was fraud as to the inclusion of the acreage east of the road, the plaintiffs were on notice from the date of execution, December 19, 1970. Even if they did not know about it in 1970, they clearly knew of its inclusion in 1978 when they began to try to get out of the lease.
I am not persuaded by the arguments that Arkel is estopped to raise the statute of limitations defense because of the assurances by its alleged agent Joe Dawson that he would take care of the problem. Arkel was dissolved as a corporation in 1977; therefore, Mr. Dawson could not have been its agent after that time. Further, Mr. Cagle met with representatives of the assignee of the Cagle lease, T.V.A., in 1978, and they refused his request to release the land east of the road to Mr. Cagle. Mr. Cagle could not have reasonably relied on Dawson's assurances to correct things when the new lessee refused to do so. Reliance is an essential element of estoppel. Traders and Farmers Bank of Haleyville v. Central Bank of Alabama, 294 Ala. 622, 320 So.2d 638 (1975). Thus, this action, brought in August of 1980, was brought more than one year from the date the alleged fraud was discovered and is barred by the statute of limitations.
FAULKNER, Justice (dissenting).
I dissent.
Defendant Arkel Land Company (Arkel) appeals from the judgment of the Circuit Court of Jackson County for the plaintiffs, Barney and Sally Cagle, for $250,000.00, and the court's denial of Arkel's post-judgment motions. The suit involved a written coal mining lease between the Cagles and Arkel. The lease was dated December 19, 1970, and was executed in two counterparts, one called a short form lease, which was recorded, and the other a long form lease, which was not to be recorded.
The Cagles filed suit against Arkel and Wyatt Stuart, individually and as an agent of Arkel, on August 7, 1980. Count I alleged there was a false representation knowingly made to the plaintiffs as to the royalty rate, which was the "industry standard for the State of Alabama for similar strip mining coal leases," and that the price per ton included in the December 19, 1970, written lease was misrepresented. Plaintiffs ultimately did not prevail on this aspect of Count I. Count I also alleged that the defendants represented that under no circumstances would the written lease contain property owned by the plaintiffs in the southwest quarter of Section 18 which lies east of Jackson County Highway 92. Plaintiffs alleged that these lands were included in the written lease dated December 19, 1970, without their knowledge and consent.
Count II of the complaint alleged that the written lease had been assigned to the United States of America for the use and benefit of the Tennessee Valley Authority (TVA) and prayed for cancellation of the lease. Defendants moved to dismiss this count for lack of a necessary party (TVA), and the count was dismissed by plaintiffs on January 29, 1980.
An appearance by counsel revealed that Arkel was dissolved in the year 1977, and the jurisdiction of the court, as well as process, was challenged. Thereafter, interrogatories were propounded by the plaintiffs to Arkel, seeking to discover the shareholders of Arkel on the date of its dissolution. Answers to interrogatories disclosed that Arch Mineral Corporation was the owner of the stock of Arkel at the time of Arkel's dissolution in 1977. Thereafter, on April 6, 1981, the plaintiffs amended the complaint by naming Nelson B. Hunt, William Herbert Hunt, Ashland Oil, Inc., and Arch Mineral Corporation as defendants. The court struck Ashland Oil Company, Nelson B. Hunt, and William Herbert Hunt as parties defendant, but Arch Mineral Corporation, the sole stockholder in Arkel at the time of its dissolution, was continued as a party defendant. Proceedings against Arch Mineral Corporation were severed for a separate trial. A pre-trial order was entered on October 18, 1981, stating that the plaintiffs' claim against Arkel and Stuart was based upon fraud and deceit. The defendants pleaded *866 the general issue and the statute of limitations of one year. Plaintiffs contended the action was filed within one year from the date they discovered the fraud or within one year from the date they could have discovered the fraud by the exercise of due diligence.
After the close of the plaintiffs' (Cagles) evidence, the plaintiffs filed a written plea of estoppel to the defense of the statute of limitations, alleging:
"The defendant(s) is (are) estopped from asserting the defense of the statute of limitations due to the fact that the attorney for the defendants, Hon. Joe Dawson, was also serving as the attorney for the plaintiffs and in such position, advised the plaintiffs that they had nothing to worry about concerning the land or property east of County Road # 92 being included in said lease in that he, the said Joe Dawson as attorney for plaintiffs, had taken care of that matter for the plaintiffs and that the property east of County Hwy. 92 was not included in the lease."
At the close of the plaintiffs' evidence, the defendants moved for a directed verdict, which was denied. At the close of all the evidence, the defendants again moved for a directed verdict; the court granted the motion only as to Stuart and only as to that aspect of the case concerning the land east of Highway 92. The court instructed the jury with reference to the two issues submitted for its consideration. The first issue was against Stuart and Arkel and related to the representations of the price per ton for coal included in the lease. The second issue was against Arkel alone and related to the land east of Highway 92 being included in the lease. The jury was instructed that any verdict referable to the royalty price would be against both Arkel and Stuart and that any verdict referable to the land east of the road must be against Arkel alone. Verdict forms consistent with these instructions were submitted to the jury. Thereafter, the jury returned a verdict in favor of the plaintiffs and against Arkel alone for $250,000.00. Thus, the jury based its verdict only on the alleged fraud with respect to the land east of the road. Judgment was entered accordingly by the court on December 16, 1981. Motion for judgment notwithstanding the verdict and alternatively for new trial was filed January 14, 1982, amended February 26, 1982, and heard on February 26, 1982.
The court overruled that motion March 2, 1982. To avoid any uncertainty with respect to the plaintiffs' claim against Arch Mineral Corporation, the judgment in favor of the plaintiffs and against Arkel was made final pursuant to Rule 54(b), A.R. Civ.P., by order entered March 30, 1982. Notice of appeal was filed April 1, 1982.
The Cagles' case is predicated upon their contention that the land east of the road was not to have been included in the lease but was included by fraud. To prove fraud, one must produce clear and convincing proof. Lamb v. Opelika Production Credit Assoc., 367 So.2d 957 (Ala.1979). I contend that the Cagles did not meet their burden.
The lease was prepared by an attorney and was executed in his office. He prepared the lease at the request of Arkel, but he had been an attorney for the Cagles for thirty-five years. The lease was executed in two counterparts, one called a short form lease, which was recorded, and the other a long form lease, which was not to be recorded. The Cagles admitted receiving copies of the two parts a few days after the execution.
Evidence was introduced at trial that Mr. Cagle admittedly signed a short form lease for recording purposes which included the land east of the road. The following is Mr. Cagle's account of the conversation with the attorney about including lands east of the road:
"Q. Who was present at the time that these leases were prepared?
"A. Me, and my wife, and [the attorney], and Dwight [Wyatt?] Stuart.
"Q. All right; and you did have a discussion about the twenty acres of landor the lands that lay on the east side of the road, with [the attorney], didn't you?

*867 "A. Yes, sir.
"Q. And what, if anything, did he tell you?
"A. He told me that they would leave it out, and I kept calling his hand to it; and he said, `I'm going'He said he was writing the short form; and he said, `I can't leave it out on this short form, but I'm going to come back with a long form and leave it out.'
"Q. All right; so he told you that he was going to put it in the short form but that he was going to leave it out of the long form?
". . . .
"Q. All right; you understood that the 315 acres was to be in the short form, is that right?
"A. Yes; he said that he was putting it in the short form; and I asked him why was he putting it all in there; he said that he had to, but he would come back and take it out in the long form.
"Q. Okay; so you knew that the 315 acres was in the short form when you and Mrs. Cagle signed it?

"A. Yes, sir." (Emphasis added.)
Cagle testified that the attorney said he would take the wording concerning the land on the east side of the road out of the long form lease. However, when the Cagles signed the long form lease the following language was immediately above, and on the same page as, their signatures:
"Lessee covenants and agrees with Lessor that Lessee will not mine any coal from any part of the South half of the Southwest quarter of Section 18, Township 2 South, Range 10 East which is East of the public highway, which is known as County Highway No. 92, and which runs in a North and South direction across the Southwest quarter of the Southwest quarter of said Section 18, without the written consent of the Lessor."
Mrs. Cagle also testified that she noticed the "written consent" provision at the time of execution.
It is my opinion that Mr. Cagle's testimony stating that the attorney was to leave the east land out of the long form lease does not amount to a showing of misrepresentation or concealment by the attorney of the terms of the lease. This court held in Blake v. Coates, 292 Ala. 351, 294 So.2d 433 (1974), that a party signing a guaranty note cannot defeat his liability as guarantor with the oral statement, "They told me I would not be personally liable." Similarly, I believe that Mr. Cagle, who knew that all of the lands were included in the short form lease, should not be allowed to alter or amend the lease by oral testimony to the effect "They told me they would change it."
As to the Cagles' contention that the attorney erred in the preparation of the lease, I find that under the facts of this case there is no evidence to make Arkel responsible for that error. It is difficult for me to understand how the majority could hold that Mr. Dawson could be said to be Arkel's agent in 1978, when in fact, Arkel had been dissolved in 1977. Thus, the dissolution terminated the attorney-client relationship between Arkel and Dawson, and no representation made by Dawson to Cagle could be binding on Arkel.
Having written the original opinion, I have not read or heard anything to change my position.
MADDOX and ADAMS, JJ., concur.
NOTES
[1] The court denied Arkel's motion to dismiss, and Arkel has taken no appeal from that ruling. We note that the Code section applicable at the time this suit was filed, § 10-2-212, provided a five-year limitation for suits against corporations after dissolution. Cf. Code 1975, § 10-2A-203, added by Acts 1980, Act No. 80-633, which allows suit for only two years after dissolution, effective January 1, 1981.